IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville May 20, 2025

**LAVONTE DOUGLAS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Hardeman County**
**No. 19-CR-103        J. Weber McCraw, Judge**

_____

**No. W2024-01341-CCA-R3-PC**

_____

In 2020, a Hardeman County jury convicted the Petitioner, Lavonte Douglas, of first degree felony murder and attempted aggravated robbery, and the trial court sentenced him to an effective sentence of life. The Petitioner appealed, and this court affirmed his conviction and sentence. *State v. Douglas*, No. W2020-01012-CCA-R3-CD, 2021 WL 4480904, at *1 (Tenn. Crim. App. Sept. 30, 2020), *perm. app. denied* (Tenn. Feb. 28, 2023). The Petitioner filed a timely petition for post-conviction relief, amended by counsel, alleging that he received the ineffective assistance of counsel because his trial counsel failed to: object to hearsay statements; request in writing a curative jury instruction; and give a closing argument. He further contended that the cumulative effect of these errors entitled him to post-conviction relief. The post-conviction court denied his petition after a hearing. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the Court, in which TIMOTHY L. EASTER and MATTHEW J. WILSON, JJ., joined.

Jamie Lynn Davis, Adamsville, Tennessee, for the appellant, Lavonte Douglas.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Patrick Dugan, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Amy Weirich, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts and Background**

**A. Trial and Appeal**

This case arises from the Petitioner's participation in a shooting on March 20, 2018. On direct appeal, this court summarized the facts as follows.

At trial, El Ranchito owner Maria Howell, Ms. Howell's daughter Audrey Howell, and employee Francisco Rodriquez testified about the robbery. On March 20, 2018, around closing time, Ms. Howell was in the restaurant's office. Mr. Rodriquez was working in the kitchen with Ms. Howell's sister-in-law Jazmin Martinez and the victim, who was Ms. Howell's nephew. Audrey was inside the employee restroom.

Mr. Rodriquez testified that he saw the back door open and that a man entered, who approached "the cook" and demanded money. The man then approached Mr. Rodriquez, pulled out a small gun, and said, "Give me the money – give me the money. I will kill you. Give me the money." Mr. Rodriquez opined that the man knew "something" because Mr. Rodriquez and the cook typically kept cash in the evenings. He noted that the man resembled one or two El Ranchito employees and seemed nervous. Mr. Rodriquez described the man as a "little guy" who wore a hooded sweatshirt, blue jeans, and tennis shoes.

Mr. Rodriquez told the man that he had no money but that he would retrieve money from the cash register. Mr. Rodriquez walked away from the man toward the register before running through a door into the kitchen. Meanwhile, Ms. Howell heard "noise and voices that didn't belong there" and walked to the office door to investigate. She saw a young Black man walking from the kitchen area with a gun, and she returned to the office to retrieve her own gun. Ms. Howell, Mr. Rodriquez, and Audrey all heard a gunshot and saw the victim on the floor after the robbers fled. Audrey called 911 from inside the restroom. Ms. Howell noted that the victim complied with the robbers' demands.

Ms. Howell affirmed that El Ranchito had surveillance cameras that recorded the incident from multiple angles. The recordings, which were received as an exhibit and did not contain audio, reflected that two men walked across the back parking lot of El Ranchito and entered through a back door. One man, who was later identified as co-defendant Blakemore, wore a black sweatshirt and white shoes and held a handgun in his right hand. The other man, who was later identified as the [Petitioner], held a rifle and wore a black shirt, black shoes, and black pants with a white horizontal stripe on the upper left thigh. The manner in which the [Petitioner] held the rifle reflected that he pulled the trigger with his left hand.

The recordings reflected that after entering the kitchen, co-defendant

2

Blakemore turned to his right, looked over his shoulder at the [Petitioner], and pointed to their left. The [Petitioner] walked to the left toward the dishwashing area. Co-defendant Blakemore walked to his right, pointed his handgun at a woman in a green shirt, who was identified as Ms. Martinez, and walked toward a man wearing a white shirt, who was identified as Mr. Rodriquez. Mr. Rodriquez gestured toward an area behind co-defendant Blakemore; when co-defendant Blakemore turned, Mr. Rodriquez ran out of the camera frame. Simultaneously, Ms. Howell was briefly visible walking into a doorway behind co-defendant Blakemore and quickly ducking back inside the office.

While the events involving co-defendant Blakemore occurred, the [Petitioner] walked into the dishwashing area and pointed his rifle at the victim, who was wearing headphones connected to his cell phone. When the victim saw the [Petitioner], he held up his hands, slowly removed his headphones, set his cell phone on the counter, and stood facing the [Petitioner] with his hands still raised. The [Petitioner] came closer to the victim and shot him in the left upper chest. The victim clutched his chest and walked forward before collapsing onto his side; blood was visible dripping onto the floor. Meanwhile, co-defendant Blakemore had run to the back door and gestured toward where the [Petitioner] stood, and both of them fled the building and ran in the direction from which they came.

In the 911 recording, Audrey stated that she thought she heard a gunshot, and a woman's screaming was audible in the background. Another person, whom Audrey identified as Ms. Howell, began speaking to the operator and stated that her nephew had been shot. On cross-examination, Audrey acknowledged her April 6, 2018 written police statement and recalled that a person named Tacyvin Douglas called El Ranchito earlier in the day. At the time, she did not consider the call to be suspicious.

Former Bolivar Chief of Police Pat Baker testified that he arrived at the crime scene as medical personnel were "working on" the victim in an ambulance. Chief Baker stated that as a result of information co-defendant Blakemore gave during his subsequent police statement, he was able to identify co-defendant Blakemore in the El Ranchito surveillance recording. Chief Baker noted that in the recording, co-defendant Blakemore was holding a handgun and wearing white tennis shoes and a hooded sweatshirt with a "white emblem" on the left chest. Chief Baker identified the [Petitioner] in the recording as the man holding the rifle in a "left-handed stance." He agreed that the robbers fled toward a nearby subdivision. According to Chief Baker, a resident of the subdivision reported seeing a white Buick leave the area.

3

Chief Baker testified that the morning after the incident, he sent an officer to speak with Bolivar Central High School (BCHS) principal Jeff Barnes. Mr. Barnes told the officer that one of his students, Brentarrious Holmes, had a white car, and officers later conducted a traffic stop of Mr. Holmes and took him to the police station. Mr. Holmes, whose nickname was "Frog," told officers that he gave co-defendant Blakemore and the [Petitioner] a ride the previous night and that co-defendant Blakemore admitted to Mr. Holmes that "they" had robbed El Ranchito and shot the victim.

Chief Baker testified that the police also interviewed co-defendant Blakemore, who stated that he and the [Petitioner] entered El Ranchito, that co-defendant Blakemore held the employees at gunpoint, that the [Petitioner] had a rifle and shot the victim, and that co-defendant Blakemore and the [Petitioner] went to the nearby subdivision and got into co-defendant Gray's car. Chief Baker stated that co-defendant Blakemore was "nervous, acting confused, [and] didn't really want to cooperate and give the names. He was dodging the questions." Chief Baker said that he determined co-defendant Blakemore was not being truthful. Coincidentally, at that moment during co-defendant Blakemore's interview, Chief Baker received a text message. Chief Baker took the opportunity to look at his cell phone and began gathering his notes; he told co-defendant Blakemore that the police "didn't need him anymore, that [they] just recovered the guns." As Chief Baker was leaving, co-defendant Blakemore expressed his desire to "tell [him] the truth." Chief Baker briefly left the interrogation room, and when he returned, co-defendant Blakemore was telling a juvenile officer and Bolivar Police Department (BPD) Officer Chris Burkeen "how it had happened." Chief Baker recorded the statement, which implicated the [Petitioner] and co-defendant Gray. He denied that he offered co-defendant Blakemore anything for his statement.

Chief Baker testified that he did not make a crime scene log for El Ranchito and that to his knowledge, no witness statements were taken at the scene. He stated that because the murder was recorded, it "was actually a unique case." Chief Baker noted that none of the employees recognized the robbers, and he told them to go home and write down any details they remembered. He also told them that the police would contact them later to take written statements. The following day, the BPD arrested the [Petitioner], co-defendant Blakemore, and co-defendant Gray. Chief Baker stated that the Tennessee Bureau of Investigation (TBI) later discovered a fourth suspect.

4

On cross-examination, Chief Baker testified that prior to his retirement, he worked in law enforcement for thirty-one years. Chief Baker could not recall any person he knew who shot a gun using his non-dominant hand, although he was "sure there [were]" such people. Chief Baker acknowledged that the robbers did not wear gloves and that they touched the back doorknob; he said, however, that the door was open and that the handle was wet due to the weather, which he described as a "real hard mist." He stated that it was impossible to collect fingerprints from a wet surface because the powder used in fingerprint testing "clump[ed] up." He acknowledged that the police did not follow up with the eyewitnesses after the night of the robbery. Chief Baker denied declining help from the Hardeman County Sheriff's Office (HCSO). He stated that during his eight years as the BPD chief, he investigated between ten and twelve murders. He averred that all of the investigations were handled without help from the HCSO or the TBI. Chief Baker clarified that he was referring to "investigating the case, actually hitting the street, taking the statements, and doing the charges[.]" He added that before he was chief, he recalled one instance in which a TBI blood spatter expert was consulted; likewise, he acknowledged the possibility that he asked the HCSO to check an address or a vehicle registration. Chief Baker noted that the State obtained convictions in all the murder cases he investigated aside from one in which the jury found that the defendant acted in self-defense.

Chief Baker testified that co-defendant Blakemore's police statement reflected that he "was picked up on Marvin Street," which was a dead-end street near El Ranchito, and that Officer Burkeen found a box of Black and Mild cigarillos (Black and Milds) in that area. Chief Baker thought that Officer Burkeen placed the Black and Milds into evidence, although to his knowledge no further testing was performed on them. He noted that they also would have been wet due to the weather. Chief Baker was not aware of a method to "run . . . the SKU number" to determine the store at which the Black and Milds were purchased.

Chief Baker testified that the day after the robbery, he interviewed co-defendant Blakemore and Officer Shane Swift interviewed co-defendant Gray. Chief Baker clarified that although co-defendant Gray "was associated with" a white Buick, the person the police stopped and took to the police station the morning after the robbery was Mr. Holmes, who also drove a white Buick. Chief Baker did not recall telling Officer Burkeen to bring Mr. Holmes, Tacyvin Douglas, and co-defendant Gray from school to the police department, although he said if Officer Burkeen included this fact in a written report, he had no reason to doubt its veracity.

5

Chief Baker testified that he interviewed Mr. Holmes at the police station. Mr. Holmes told Chief Baker that he picked up co-defendant Blakemore and the [Petitioner] the previous night and that after he dropped off the [Petitioner], co-defendant Blakemore acted upset, hit "the back of the seat," and admitted to shooting the victim. Mr. Holmes also relayed that the murder weapon had been taken to the home of Jonathan Geanes, whose nickname was "Shotgun." Chief Baker stated that Mr. Geanes evaded the police for a period of time, that the police surveilled Mr. Geanes's mother's house for a couple of days, that they eventually searched the house twice pursuant to a search warrant, and that the murder weapon was never recovered.

Chief Baker testified that they chose not to search the co-defendants' houses immediately after the robbery because the guns were alleged to have been in Mr. Geanes's possession and because the clothing worn by the robbers "pretty much matched what everybody wears on the street every day, black clothes, black hood, black ski masks." Chief Baker noted that at some point later in the investigation, officers searched the co-defendants' houses. The police recovered a purple bandana and a black wool cap from co-defendant Gray's house; Chief Baker noted that co-defendant Gray had entered a guilty plea. Chief Baker stated that the bandana and cap were never DNA tested, and he noted that no DNA testing was performed in this case because no DNA evidence was recovered at the crime scene. Similarly, co-defendant Gray's car was not tested for blood or gunpowder residue.

Chief Baker testified that he never suspected that Mr. Holmes was involved in the robbery because co-defendant Blakemore corroborated the [Petitioner]'s presence in Mr. Holmes's car that evening. He stated that co-defendant Blakemore relayed that the Defendant was the shooter and that during his police interview, co-defendant Blakemore was wearing the same white tennis shoes depicted on the surveillance recording. The police collected the shoes as evidence. Chief Baker said that after co-defendant Blakemore gave his statement, the police continued to search for the rifle and Mr. Geanes. Co-defendant Blakemore's attorney also contacted Chief Baker and told him that "there was a lot more to the story than [Chief Baker] was told previously and that [co-defendant Blakemore] wanted to cooperate one hundred percent." Co-defendant Blakemore returned to the police station two or three weeks later, and TBI and HCSO officers took him "around to every place and every stop that he did . . . that night," during which co-defendant Blakemore implicated a fourth person, co-defendant Robinson. Chief Baker stated that the police were able to conclude their investigation after co-defendant Blakemore gave "one hundred percent detail of what happened[.]"

6

Chief Baker repeatedly disagreed that the BPD stopped its investigation after co-defendant Blakemore gave his initial statement. He noted that the BPD offered a ten thousand dollar reward to anyone who could produce the gun used in the murder. Chief Baker did not remember an individual named Tacyvin Douglas, and he stated that he did not interview him. Likewise, Chief Baker did not recall Officer Burkeen's report that Tacyvin was friends with co-defendant Robinson, co-defendant Blakemore, and Mr. Holmes. Chief Baker stated that he may have spoken to Tacyvin and that if Tacyvin had important information, Chief Baker would have taken a written statement from him. Chief Baker did not remember Officer Burkeen's conversation with a person named Luis Chaviriz.

Chief Baker testified that two weeks after the robbery, the TBI and HCSO were "put on lead on the case with [the BPD] assisting." He affirmed that in the twenty-eight years he had worked for the BPD, this was "totally unheard of," but he maintained that the BPD was diligently investigating the case during that time.

Chief Baker testified that Raines East Apartments (Raines East) was located near El Ranchito, that it was a newer apartment complex, and that no security footage from the time of the robbery was available because the cameras there did not function. Chief Baker noted that a former officer worked part-time as a manager at Raines East and that the officer and another manager had previously informed the police department multiple times that the security cameras did not function. Chief Baker went to Raines East eight or nine days after the robbery to inquire about the surveillance cameras; he acknowledged that some security cameras recorded over existing footage, but he stated that he was not concerned "about that."

Chief Baker testified that he had never investigated a gang-related case. He stated that in the [Petitioner]'s case, the gang membership of some of the individuals involved "never came up" and that he never asked "that question." On redirect examination, Chief Baker testified that co-defendant Gray had entered a guilty plea and that this was "a pretty good indication that it might have been his car." Chief Baker stated that Mr. Holmes conveyed that he picked up two individuals at Raines East.

BPD Officer Shane Swift testified that he processed the crime scene and that he collected a shell casing from the kitchen. He noted that bullet fragments were recovered from a ceramic tile wall at El Ranchito at a later date because a construction crew was required to extract them. Officer Swift also interviewed co-defendant Gray, who initially admitted "[v]ery little

involvement" but eventually entered a guilty plea. Co-defendant Gray told him that a gun had been in his car, and Investigator Futtrell "checked the car." Officer Swift identified items of clothing that were collected from co-defendant Gray's house, which were a black toboggan, a purple bandana, and a hooded sweatshirt with a "Nike logo" on the left front chest. He also collected a pair of white "Nike Air Force Ones" from co-defendant Blakemore. Officer Swift opined that the clothing he collected corresponded to the clothing worn by the person who was not the shooter in the El Ranchito surveillance recording.

On cross-examination, Officer Swift acknowledged that no physical evidence connected the [Petitioner] with the incident. He did not recall whether it was evident in the surveillance recording if the perpetrators were wearing gloves during the robbery. To his recollection, no fingerprints were collected, although he did not remember why. Officer Swift thought that the shell casing was sent for testing; he noted, though, that the shell casing was found on a wet portion of the kitchen floor. He stated that some of the El Ranchito employees gave written statements, although he did not remember when they gave the statements. Officer Swift said that he worked at the BPD for nineteen years, that he worked on more than ten murder cases, and that sometimes the HCSO and the TBI assisted, although he did not recall any specific examples of such cases. He was an investigator on three or four murder cases with the BPD. Officer Swift stated that it was the Chief's job to call in other agencies for help. Officer Swift said that another officer took co-defendant Blakemore's statement and that he recalled very little about the statement. Officer Swift averred that he met with the district attorney's office in advance of trial to discuss the case, but he did not review the entire case file before his testimony because he no longer worked for the BPD.

Relative to Tacyvin, Officer Swift testified that he remembered the name and that he was "sure somebody talked to him" at the police station because they would not "bring him up there" without talking to him. He was not aware that co-defendant Gray pled no contest to second degree murder in this case. He did not recall co-defendant Gray's stating that he was "worried that Tacyvin Douglas was the one who turned him in" to the police. Officer Swift agreed that he told co-defendant Gray that he would check the surveillance footage at Raines East; he noted that Chief Baker went to the apartment complex alone. Officer Swift stated that he and other officers drove through Bolivar in search of surveillance cameras. He did not know whether the clothing recovered at co-defendant Gray's house was ever DNA tested. He stated that Investigator Futtrell searched co-defendant Gray's vehicle; he did not know whether the car was ever tested for blood stains or gunpowder residue. Officer Swift acknowledged that co-defendant Gray's

8

house was searched three days after the robbery; he stated that the timing of the search depended on "when they bec[ame] suspects, what was said, . . . what order it became important." He was not involved in the search of Mr. Geanes's home.

Officer Swift testified that he interviewed the [Petitioner] and that the [Petitioner] "didn't say much of anything." The [Petitioner] admitted that Mr. Holmes and co-defendant Blakemore picked him up in a white Buick sedan and that he rode to Whiteville with them, but he denied being involved in the robbery. Officer Swift stated that he searched co-defendant Blakemore's home, although he did not recall when this occurred. He noted that the police went there once without conducting a search and that the TBI accompanied officers there at a later date to collect clothing. He denied that after co-defendant Blakemore gave his statement, the BPD stopped its investigation. When asked what else he did to investigate, Officer Swift said, "I'd have to look at the files and my notes and I don't have those up here." Officer Swift stated that in order to corroborate co-defendant Blakemore's police statement, he interviewed witnesses and "looked for videos," although he could not remember who he interviewed. When asked whether his interviews provided corroboration for co-defendant Blakemore's statement, Officer Swift responded that he did not remember.

BPD Officer Chris Burkeen testified that on the evening of the robbery, he photographed the victim's body at the hospital and that around 1:30 a.m., he and another officer searched the area between El Ranchito and Marvin Road. They found an unopened box of Black and Milds "right at the end of Marvin Road[.]" Officer Burkeen noted that the plastic wrapper had "no condensation, no nothing on it." He collected the Black and Milds as evidence, but he did not know whether the package was tested for fingerprints. He explained that although he was an investigator at the time of trial, he was a patrol sergeant at the time of the incident and that he did not order evidence testing.

Officer Burkeen testified that while he was at the crime scene, he saw Mr. Barnes, who came to offer support to the victim's family. Officer Burkeen went to BCHS later that morning and spoke to Mr. Barnes and an assistant principal. Mr. Barnes asked Officer Burkeen if the police had any leads other than a white Buick having been seen in the area. When Officer Burkeen mentioned the Black and Milds, Mr. Barnes relayed that some days prior, Tacyvin, co-defendant Robinson, and Mr. Holmes came to school smelling like marijuana and that Mr. Barnes searched them. Although Mr. Barnes found no marijuana, he found and confiscated several packs of Black and Milds. Mr. Barnes also told him that Mr. Holmes and co-defendant Gray

9

drove white Buicks and that co-defendant Gray worked at El Ranchito.

Officer Burkeen testified that officers brought Tacyvin, co-defendant Gray, and Mr. Holmes to the police station for questioning. Chief Baker interviewed Mr. Holmes and told Officer Burkeen that Mr. Holmes was "talking." Mr. Holmes asserted that he picked up the [Petitioner] and co-defendant Blakemore at Raines East and drove them to Whiteville. According to Mr. Holmes, co-defendant Blakemore was "visibly upset," hit one of the car seats, and said, "We shot Big Mike. We shot Big Mike." Officer Burkeen stated that no evidence indicated that Tacyvin was involved in the robbery.

On cross-examination, Officer Burkeen testified that although he had "heard of" right-handed individuals shooting left-handed, he was not "familiar with it." He did not recall whether it rained the night of the robbery. Officer Burkeen stated that he was not "in investigations" at the time of his involvement in this case, but that generally, he would have checked the Black and Milds for fingerprints. Officer Burkeen stated that Mr. Barnes also informed him of a gas station robbery in Whiteville prior to the El Ranchito robbery. He was unsure whether Black and Milds were taken during the Whiteville robbery.

Officer Burkeen testified that Mr. Barnes told him that Tacyvin, Mr. Holmes, and co-defendants Gray and Robinson spent time together. Officer Burkeen denied investigating any "gang relations" between the suspects, but he noted that he "was just out of the loop on a lot of it." He agreed that Mr. Barnes never mentioned the [Petitioner] and that the [Petitioner] was not a BCHS student at the time of the robbery. Mr. Barnes told Officer Burkeen that Tacyvin and co-defendant Gray arrived late to school the morning after the robbery and that Tacyvin "acted like he didn't know about the murder."

Officer Burkeen testified that he sent a photograph of Mr. Holmes's car to Luis Chaviriz, an El Ranchito employee. Mr. Chaviriz reported to Officer Burkeen that on the Sunday before the shooting, he saw a "suspicious white car . . . in the back parking lot of El Ranchito[.]" Mr. Chaviriz approached the car, but it "sped off." Mr. Chaviriz confirmed that co-defendant Gray's car was similar to the one he saw. Officer Burkeen acknowledged that Mr. Chaviriz never gave a written statement. When asked whether the police tried to obtain surveillance footage of the back parking lot at El Ranchito, Officer Burkeen reiterated that although he would generally have attempted to do such, he was not an investigator at that point in time. He stated that he relayed his conversation with Mr. Chaviriz to Chief Baker and Officer Swift.

10

Officer Burkeen testified that two days after the robbery, he prepared a search warrant for Mr. Geanes's house upon request from Officer Swift, who was at the house. He agreed that no weapons were found there. Officer Burkeen stated that other officers searched co-defendant Gray's house, that no one searched co-defendant Blakemore's house, and that he did not search the [Petitioner]'s house. When asked whether any officers interviewed Tacyvin during his time at the police station, Officer Burkeen responded that he knew Tacyvin was "in the back with" an investigator and Officer Swift, but he did not know whether anyone interviewed Tacyvin.

Mr. Barnes testified that at the time of the El Ranchito robbery, he was principal of BCHS. After his daughter told him that the victim had been killed, Mr. Barnes went to the crime scene because he could not sleep, and he noted that he was "nosy" and wanted to see if there was "anything [he] could do." Mr. Barnes stated that the victim was a "good kid." While at the crime scene, Mr. Barnes spoke to some of his former students and the victim's uncles. He overheard a conversation between Chief Baker and Ms. Howell about a white Buick. The following morning, Officer Burkeen came to BCHS and told Mr. Barnes about having found a pack of Black and Milds. Mr. Barnes testified consistently with Officer Burkeen regarding the incident in which he confiscated Black and Milds from Tacyvin, co-defendant Robinson, and co-defendant Gray, although Mr. Barnes estimated that the incident occurred a couple of weeks before the robbery. Mr. Barnes noted that he could not search co-defendant Gray's Buick during the previous incident because it was parked off school property. He stated that Mr. Holmes drove an "identical" white Buick.

Mr. Barnes testified that the police asked him to watch surveillance footage from a gas station in Whiteville on the night of the robbery. The recording was played in court, and Mr. Barnes identified Mr. Holmes, co-defendant Blakemore, the [Petitioner], and Cameron Boyle, who were all traveling in Mr. Holmes's white Buick sedan.

On cross-examination, Mr. Barnes testified that although the [Petitioner] was not a BCHS student at the time of the robbery, he had previously been a student and that the other three young men in the recording were students at the time of the robbery. He affirmed that he could identify each person in the recording on sight, and he noted that the [Petitioner] "had a walk" he recognized in the recording.

Mr. Barnes agreed that he identified Tacyvin to Officer Burkeen as one of the students involved in the Black and Milds incident. Because

11

Tacyvin was a minor at that time, the school called his mother. Tacyvin stayed in the office with Mr. Barnes until she arrived, and she accompanied Tacyvin to the police station. When asked how tall Tacyvin was, Mr. Barnes responded that he did not know, but he estimated about five feet, nine or ten inches tall, which was about Mr. Barnes's height. He said, though, that if a juvenile arrest record indicated that Tacyvin was six feet tall, he would not dispute that measurement.

Mr. Barnes testified that he was aware of his students' gang affiliations. He affirmed that co-defendant Blakemore, co-defendant Blakemore's brother Jaquan, and co-defendant Robinson were members of the Vice Lords. He did not know whether co-defendant Gray, Mr. Geanes, or the [Petitioner] were gang members. Mr. Barnes noted that co-defendant Gray transferred schools in eleventh grade before returning in twelfth grade, that Mr. Geanes was not a BCHS student, and that he had not seen the [Petitioner] since he was expelled in January 2016.

Former Whiteville Police Chief Steven Stanley testified that in April 2018, the Hardeman County District Attorney's Office asked him to help investigate the El Ranchito robbery, along with the HCSO and the TBI. Chief Stanley noted that he was "the tech guy" and reviewed text messages, video recordings, and photographs. On April 5, 2018, Chief Stanley collected surveillance footage from a Shell gas station in Whiteville. The surveillance recording was received as an exhibit and showed a white sedan arriving at a gas pump. Two men exited the from the front seats of the vehicle and walked off screen. After a short time, a third man exited the passenger-side back seat and began to pump gas; he wore a white t-shirt, black shorts, and white tennis shoes. A fourth man exited the driver's-side back seat and walked toward another gas pump; the man wore a white t-shirt and black pants with a white patch on the upper left thigh.

On cross-examination, Chief Stanley agreed that he had previously arrested Tacyvin for an incident unrelated to this case and that Tacyvin was six feet tall, as was noted in the juvenile court complaint. On redirect examination, Chief Stanley stated that he would have assessed Tacyvin's height by asking Tacyvin or looking at his identification.

TBI Special Agent Matt Pugh testified that he became involved in this case after the District Attorney's Office contacted the TBI on April 5, 2018. He noted that the TBI initially assisted in the investigation and later took "control of" it. Agent Pugh stated that it was unusual for the TBI to come into a case fifteen days after an incident, and he indicated that in rural counties, it was more common for local law enforcement to call the TBI

12

immediately for assistance. He said that the BPD had three identified suspects—co-defendant Gray, co-defendant Blakemore, and the [Petitioner]—had taken one written statement, and had obtained one confession. However, he said that the BPD had "no documentation, very little" and that "[a] lot of leg work needed to be done to shore up the case." Agent Pugh opined that the BPD had gathered enough evidence to charge the suspects, but not to convict them. He stated that TBI agents conducted new interviews of the suspects and witnesses, including obtaining an interpreter for some of the El Ranchito employees.

Agent Pugh testified that co-defendant Blakemore was interviewed again and gave a "full confession," including that co-defendant Robinson helped plan the robbery and provided the guns. Agent Pugh averred that co-defendant Blakemore initially failed to identify co-defendant Robinson because he was co-defendant Blakemore's cousin. Agent Pugh stated that he interviewed co-defendant Robinson several times and that he did not interview co-defendant Blakemore.

At this juncture, the following exchange occurred:

[THE STATE:] And was the information that you got from [co-defendant] Blakemore through his statements and the information you got from [co-defendant] Robinson –

[DEFENSE COUNSEL]: Your Honor, I would object at this point. If he's going to be discussing [co-defendant] Robinson's statements, [co-defendant] Robinson is not here for me to cross-examine or talk about any of the information he said.

THE COURT: Response?

[THE STATE]: I'm just asking if the information is consistent. I'm not asking what was said during the course of that interview.

THE COURT: All right. Why don't you rephrase your question to ask him if it was consistent?
....
[THE STATE]: Was the information that you received from [co-defendant] Blakemore and the information you received from [co-defendant] Robinson consistent?
[AGENT PUGH]: It was extremely consistent.

Agent Pugh identified co-defendant Blakemore and the [Petitioner] in

13

the El Ranchito surveillance recording. He noted that the individuals fled toward an adjacent neighborhood. He stated that in the recording, the [Petitioner] carried the rifle in his left hand and had a white "reflective marker" on his pants. Agent Pugh said that he saw the [Petitioner] sign a property receipt with his left hand at the Memphis Juvenile Court. He stated that although a right-handed person might "occasionally" shoot with his left hand, it did not occur often.

Agent Pugh testified that during the course of the investigation, he determined that the [Petitioner] and co-defendant Blakemore fled from El Ranchito to Marvin Street, where a getaway car was waiting for them, and drove to Raines East where co-defendant Blakemore's brother and sister lived. Agent Pugh stated that although the Raines East security camera did not function, "multiple witnesses put them there immediately" after the robbery.

According to Agent Pugh's investigation, after arriving at the apartment complex, Mr. Holmes picked up co-defendant Blakemore and the [Petitioner] and drove them to Whiteville. Agent Pugh noted that Mr. Holmes's Buick had a dent in the back passenger-side fender, which was visible in the Shell station surveillance recording. Agent Pugh identified Mr. Holmes's car, Mr. Holmes, Mr. Boyle, co-defendant Blakemore, and the [Petitioner] in the Shell station surveillance recording. Agent Pugh noted that the [Petitioner] was wearing a white t-shirt and the same black pants with a white patch that he wore during the attempted robbery of El Ranchito. Agent Pugh identified booking photographs of the [Petitioner] and co-defendant Blakemore, which reflected that the [Petitioner] was six feet tall and that co-defendant Blakemore was five feet, eight or nine inches tall.

Agent Pugh testified that he was aware of Tacyvin from an unrelated investigation and that Tacyvin was "brought in" to the police department prior to the TBI's involvement in this case. When asked whether any connection existed between Tacyvin and the El Ranchito robbery, Agent Pugh responded, "Not at all." He acknowledged a booking photograph of Tacyvin that indicated he was five feet, eleven inches tall.

*See Douglas*, 2021 WL 4480904, at *1-9.

Based upon the totality of the evidence, the jury convicted the Petitioner of attempted aggravated robbery and first degree felony murder. The trial court sentenced him to three years for the aggravated robbery conviction and to life for the murder conviction.

The Petitioner appealed his convictions and sentence. *Id.* at *1. He contended: (1) the evidence was insufficient to support his convictions because his involvement was based upon uncorroborated accomplice testimony and no direct evidence linked him to the offenses; (2) his right to confront a witness was violated when a police witness referenced a non-testifying co-defendant's statement; and (3) his mandatory life sentence was unconstitutional in light of his status as a juvenile at the time of the offenses. *Id.* After a thorough review of the record and applicable law, this court affirmed his convictions and sentence. *Id.*

## A. Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel because trial counsel had: (1) failed to request a curative instruction after testimony that violated *Bruton* was admitted at trial; (2) failed to make a closing argument; (3) failed to challenge numerous hearsay statements and elicited hearsay statements. He further contended that the cumulative effect of counsel's errors entitled him to post-conviction relief.

At the hearing on the petition, the following evidence was presented[1]: The Petitioner's trial counsel ("Counsel") testified that, while the Petitioner was originally indicted with three other co-defendants, he had his own separate trial. At the time of the Petitioner's trial, two of the four had entered guilty pleas. Two of the co-defendants, Mr. Blakemore and Mr. Robinson, had given statements that implicated the Petitioner. Counsel filed a motion to sever the Petitioner's case because of the *Bruton* issues with Mr. Robinson. Counsel and the State's attorney had extensive discussions about the statements and agreed that Mr. Robinson's statements were not going to be admissible.

Counsel recalled that Agent Pugh was aware that Mr. Robinson's statement was inadmissible, but on two occasions Agent Pugh attempted to testify that Mr. Robinson gave a statement consistent with Mr. Blakemore's statement. Agent Pugh testified about Mr. Blakemore's statement, and Counsel agreed that this testimony was "arguably" hearsay. That argument was moot, however, because Counsel knew that Mr. Blakemore was going to testify at trial. The trial strategy regarding Mr. Blakemore as a witness was to show that he gave multiple, contradictory statements.

Counsel did not agree that it would have been beneficial to the Petitioner's case for the jury to hear Mr. Blakemore's statements only from him and not also from Agent Pugh.

---

[1]The parties agreed that, since the Petitioner was a juvenile at the time of the offenses, based on the Supreme Court's holding in *State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), Petitioner is entitled to a parole hearing after service of not less than twenty-five years of his sentence. The State posited that the Tennessee Department of Correction would handle this change in the interpretation of a life sentence for all juvenile offenders to comply with the Tennessee Supreme Court's holding in *Booker*.

Counsel read the transcript showing that the State attempted to ask Agent Pugh if Mr. Blakemore's statement was consistent with any information he had gotten from Mr. Robinson. Counsel objected during the trial based on the fact that Mr. Robinson was not a witness. The State said it was "just asking if the information is consistent." The trial court told the State to rephrase the question, and Agent Pugh responded that the information was "extremely consistent." Counsel said that he did not renew his objection because there is always a concern about objecting too frequently in front of the jury and drawing attention to the issue. He said he did not ask for a curative instruction or that the testimony be stricken from the record.

Counsel agreed that during cross-examination of Agent Pugh he asked, "Wasn't part of the evidence that Mr. Blakemore gave you guys was that he had said [the Petitioner's] name during the robbery." Counsel said he anticipated Mr. Blakemore testifying to this during Mr. Blakemore's testimony. Further, his strategy was to attack the Bolivar Police Department's ("BPD") investigation because they did not interview any witnesses. If Mr. Blakemore's testimony was true, then those present at the restaurant during the shooting would have heard Mr. Blakemore say the Petitioner's name, but because the police did not interview any of the witnesses, that information was not available.

Counsel said he did not think that the cumulative testimony was an issue, in part because the State presented this evidence in its opening statement. He knew the evidence was going to come in, and he wanted to use it to show the inconsistencies with Mr. Blakemore's statements and the inadequate investigation by the police department.

Counsel agreed that one of the BPD officers testified that, while co-defendant Blakemore was in the in the back of his patrol vehicle, he was hitting the seat saying, "We shot Big Mike. We shot Big Mike." He said Mr. Blakemore appeared visibly upset. Counsel agreed that this was hearsay but explained that he did not object because Mr. Blakemore was saying "we shot," showing that Mr. Blakemore accepted some responsibility. Further, another witness, Mr. Holmes, said that Mr. Blakemore was the shooter. Counsel said this played into his strategy of showing that there were inconsistent statements about who shot the victim. His theory was to prove that all the co-defendants were blaming the Petitioner after the fact, but their statements were not consistent, and they all changed their stories multiple times.

Counsel agreed that there was another hearsay statement to which he did not object during Chief Baker's testimony. The statement came when Chief Baker was asked how he developed the suspects so quickly, and he recounted how they developed a white Buick as a suspect vehicle. He went to the school and asked the principal, who indicated that John Gray had a vehicle matching that description. He then seemed to indicate that Mr. Gray gave a statement admitting that he gave the Petitioner and Mr. Blakemore a ride and that they admitted robbing El Ranchito and shooting the victim. Counsel said, however, that he did not recall Mr. Gray giving a statement, and he believed that Chief Baker was

16

referencing Mr. Holmes's statement.

Counsel explained that there were two men involved who had the exact same white vehicle: Mr. Gray and Mr. Holmes. BPD officers thought they were going to pull over Mr. Gray but they, in fact, pulled over Mr. Holmes (nickname "Frog"), and he gave a statement to police indicating that he drove the Petitioner and co-defendant Mr. Blakemore from the East Raines Apartments around the time of the shooting. The men said that they robbed El Ranchito and killed the victim, but they never indicated which of the two men shot or said they were the shooter. Counsel said he believed that Chief Baker was referencing Mr. Holmes's statement, and Counsel said he did not object because he intended to call Mr. Holmes as a witness.

Counsel said he chose not to give a closing statement, despite having one prepared, because he did not believe it was in the Petitioner's best interest. The State's attorney, Ms. Chandler, gave the closing and did a good job explaining the case. She showed the video footage of the shooting and played the 911 call. Counsel knew if he gave a closing statement, then the other State's attorney would give a rebuttal. That attorney, Counsel said, had a flair for the dramatic. He knew he would again use the shooting video and the 911 call. Counsel waived closing to attempt to appear confident in his case and confident in the jury's ability to see that his client should not be found guilty.

Counsel discussed plea negotiations and said that the State never gave an offer before trial because it believed that the Petitioner was the shooter. The day the trial began, the State offered thirty years of incarceration in exchange for a guilty plea to second degree murder. The Petitioner indicated he would accept the plea, and the parties started the plea colloquy. The Petitioner's family started yelling out from the gallery for him to go to trial and not plead guilty, so the trial judge stopped the proceedings and asked Counsel if he wanted a minute to speak with the Petitioner. The two went back and spoke privately, and the Petitioner decided that he did not want to enter a guilty plea.

Counsel said that he appealed the issue of Agent Pugh's testimony that violated *Bruton*. This court agreed with him that the agent's testimony was error, but it said that, given the weight of the evidence, the error was harmless.

During cross-examination by the State, Counsel testified that he had a strategy going into trial and that it included attacking the police department's investigation and to say that Mr. Blakemore and his brother were in the same gang and had tried to pin this murder on the Petitioner, who was not in their gang.

Counsel said that, at the time of this trial, accomplice testimony had to be corroborated. This court held that the accomplice testimony in this case was corroborated by the fact that the Petitioner was left-handed and the shooter shot left handed in the video, the height analysis done by the State, and the fact that the shooter was wearing a piece of

17

reflective clothing that appeared to match the pants the Petitioner was wearing in a video from a gas station later that evening.

Counsel said that he asked the jury during voir dire if they knew right-handed people who shot left-handed, and everyone in the jury pool said that they shot guns regularly and knew people who were right-handed but shot left-handed.

Based upon this evidence, the post-conviction court denied the Petitioner post-conviction relief. It found:

> The Court accredits the testimony of [Counsel].
>
> The Court finds that [Counsel] provided adequate assistance; [Counsel] met with [the P]etitioner and discussed the case, including possible defenses and negotiated plea opportunities. The defense counsel presented a reasonable defense for the [P]etitioner, but a jury did not accept the defense.
>
> [The] Petitioner failed to show any deficient performance by [Counsel] or that he was prejudiced. The facts did not permit a reasonable finding of not guilty.
>
> The Court find that [the P]etitioner has failed to establish the factual allegations contained in his petition by clear and convincing evidence. The [P]etitioner has not shown that (a) the services rendered by trial counsel were deficient and (b) the deficient performance was prejudicial. The [P]etitioner has not shown that the services rendered or the advice given was below the range of competence demanded of attorneys in criminal cases. The [P]etitioner has not shown that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. The [P]etitioner has not shown that he was incapable of defending himself in a court of law.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel when Counsel: (1) failed to request a curative instruction after testimony that violated *Bruton* was admitted at trial; (2) failed to make a closing argument; (3) failed to challenge numerous hearsay statements and elicited hearsay statements. He further contends that the cumulative effect of counsel's errors entitles him to post-conviction relief. The State responds that the Petitioner is not entitled to relief because he has not shown that Counsel was deficient or

that he was prejudiced.  We agree with the State.

## A. Ineffective Assistance of Counsel

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right.  T.C.A. § 40-30-103 (2014).  The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence.  T.C.A. § 40-30-110(f) (2014).  The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it.  *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001).  A post-conviction court's conclusions of law are subject to a purely de novo review by this court, with no presumption of correctness.  *Id.* at 457.  "Where a petition conclusively shows that the petitioner is entitled to no relief, it is properly dismissed without the appointment of counsel and without an evidentiary hearing."  *Givens v. State*, 702 S.W.2d 578, 580 (Tenn. Crim. App. 1985).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution.  *See State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975).  The following two-pronged test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment.  Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.  Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine "whether the advice given, or the services rendered by the attorney, are within the range of competence demanded of attorneys in criminal cases."  *Baxter*, 523 S.W.2d at 936.  To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

### 1. *Bruton* issue

19

The Petitioner first contends that Counsel was ineffective because he failed to request a curative instruction or seek any other remedial measure after Agent Pugh's testimony was admitted in violation of *Bruton* and *Crawford*. The State responds that the Petitioner failed to show that Counsel's representation was deficient or that he was prejudiced.

In the Petitioner's appeal from his conviction and sentence, we addressed the issue of Agent Pugh's testimony. We first recounted the law applicable to the issue, stating:

> Our supreme court has recounted that the rule announced by the United States Supreme Court in *Bruton v. United States*, 321 U.S. 193 (1968), "proscribes, generally, the use of one co-defendant's confession to implicate the other as being violative of the nonconfess[ing] co-defendant's Sixth Amendment right of confrontation." State v. Elliot, 524 S.W.2d 473, 477 (Tenn. 1975). Moreover, in *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that testimonial hearsay statements violate a defendant's confrontation rights and are only admissible when (1) the declarant is unavailable and (2) the defendant has had a prior opportunity to cross-examine the declarant. 541 U.S. at 68-69; *see also State v. Maclin*, 183 S.W.3d 335, 345 (Tenn. 2006), abrogated by *State v. Cannon*, 254 S.W.3d 287 (Tenn. 2008). When hearsay is non-testimonial, the Tennessee Rules of Evidence govern its admissibility. *State v. Franklin*, 308 S.W.3d 799, 810 (Tenn. 2010). Non-hearsay statements—i.e., statements not admitted for the truth of the matter asserted—do not violate the Confrontation Clause, whether or not the statements are testimonial. *Id.* "Whether the admission of hearsay statements violated a defendant's confrontation rights is . . . a pure question of law" that we review de novo. *Franklin*, 308 S.W.3d at 809.

*Douglas*, 2021 WL 4480904, at *22. We noted that:

> When the prosecutor began to ask a question comparing co-defendant Robinson's interview to co-defendant Blakemore's interview, the [Petitioner] objected on confrontation grounds, as it was not anticipated that co-defendant Robinson would testify. The prosecutor responded that he only sought to inquire about whether the statements were consistent. The trial court instructed the prosecutor to rephrase the question to ask whether the statements were consistent, and Agent Pugh replied that they were "[e]xtremely consistent." Later, the State asked Agent Pugh how he corroborated co-defendant Blakemore's identification of the shooter. Agent Pugh began to reply that co-defendant Robinson's interview corroborated it, upon which the [Petitioner's] second confrontation objection was sustained.

20

However, the trial court gave the jury no instruction to disregard the answer.

*Id.*

This court held that the agent's testimony violated the Confrontation Clause. We found, however, that the error was harmless beyond a reasonable doubt. We stated:

> The [Petitioner's] defense theory was to highlight the poorly-conducted BPD investigation, diminish co-defendant Blakemore's credibility, and cast blame on Tacyvin Douglas as the true perpetrator. Although we acknowledge that Agent Pugh's improper references to co-defendant Robinson's police statement were relevant to the crucial question of identity, as we stated above, the evidence of identity was sufficient to support the [Petitioner's] convictions. The [Petitioner's] identity as the shooter was established by co-defendant Blakemore's testimony and adequately corroborated by the matching pants the [Petitioner] wore in the El Ranchito and Shell station recordings, the [Petitioner's] left-handedness, his height, his presence with co-defendant Blakemore at Jaquan's apartment and in Mr. Holmes's car after the shooting, and his known friendship with the co-defendants. In light of the evidence of the [Petitioner's] guilt and the brevity of the two references to co-defendant Robinson's interview, this error was harmless beyond a reasonable doubt.

*Id*. at *23.

In this post-conviction petition, the Petitioner contended that his trial counsel was ineffective for not requesting a curative instruction or any other remedial measure. Counsel testified that he did not renew his objection because he did not want to call additional attention to this issue by over objecting. He agreed that he could have requested a curative instruction but also felt that to do so would highlight the issue for the jury. To be entitled to relief, the Petitioner must be able to prove by clear and convincing that, but for Counsel's failure to request a curative instruction, he would not have been found guilty. He cannot meet this burden. This court found that any violation of the Confrontation Clause was harmless beyond a reasonable doubt. Therefore, the Petitioner cannot prove that Counsel's failure to request a curative instruction regarding the testimony prejudiced him. He is not entitled to relief on this issue.

### 2. Closing Argument

The Petitioner next contends that Counsel was ineffective for failing to give a closing argument. The State again asserts that the Petitioner cannot show that Counsel was deficient or that he was prejudiced.

21

The trial court accredited Counsel's testimony. Counsel testified that he had a closing argument prepared, but he did not give it because he thought it was not in the Petitioner's best interest. He explained that one of the State's attorneys, Ms. Chandler, gave the closing and did a good job explaining the case. She showed the video footage of the shooting and played the 911 call. Counsel knew if he gave a closing statement, then the other State's attorney would give a rebuttal. That attorney, Counsel said, had a flair for the "dramatic." He knew he would again use the shooting video and the 911 call. He waived closing in an attempt to appear confident in his case and confident in the jury's ability to see that his client should not be found guilty.

Counsel made a tactical decision. We defer to counsel's strategic and tactical decisions, even if such decisions were unsuccessful or harmful to the defense, so long as they were "informed ones based upon adequate preparation." *Moore v. State*, 485 S.W.3d 411, 419 (Tenn. 2016) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). In other words, so long as counsel's decisions are made after adequate preparation, this court "will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Berry v. State*, 366 S.W.3d 160, 172-173 (Tenn. Crim. App. 2011). Thus, a petitioner who alleges the ineffective assistance of counsel must, through clear and convincing evidence, overcome the strong presumption "that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation omitted).

After review, we agree with the post-conviction court that Counsel's performance in this regard was not deficient. He made a tactical decision that it would be more advantageous to the Petitioner for him not to give the closing argument that he had prepared to prevent the State from presenting a rebuttal. The Petitioner is not entitled to relief on this issue.

### 3. Hearsay Objections

The Petitioner next contends that Counsel was ineffective for failing to challenge numerous hearsay statements. The Petitioner asserts Counsel should have objected when other witnesses testified what co-defendant Mr. Blakemore's testimony would be before Mr. Blakemore testified. Counsel testified that he was not concerned with this testimony because Mr. Blakemore was going to testify. Rather than object, he wanted to cross-examine these witnesses and Mr. Blakemore about the inconsistencies in Mr. Blakemore's multiple statements. His aim was to show that Mr. Blakemore and his brother were affiliated with the same gang and were trying to blame the Petitioner for the victim's murder. Counsel said that the inconsistencies in Mr. Blakemore's statements supported that theory.

Again, we defer to counsel's strategic and tactical decisions, even if such decisions

were unsuccessful or harmful to the defense, so long as they were "informed ones based upon adequate preparation." *Moore*, 485 S.W.3d at 419 (Tenn. 2016). Counsel was clearly prepared for this case, had a sound trial strategy, and made tactical decisions in attempt to execute that trial strategy. As such, we conclude that he was not deficient. The Petitioner is not entitled to relief on this issue.

## B. Cumulative Error

To the extent that Petitioner seeks relief based upon the cumulative effect of the alleged errors, he is not entitled to relief because he has failed to show any errors to accumulate. *See State v. Hester*, 324 S.W.3d 1, 77 (2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error . . . .").

## III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

____s/ <em>Robert W. Wedemeyer</em>_____<br>ROBERT W. WEDEMEYER, JUDGE